UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

In re:

EDRA D. BLIXSETH,

                  Debtor.

Case No. 09-60452
Chapter 7

ATIGEO LLC (f/k/a AZIMYTH LLC) and
xPatterns LLC,
     Plaintiffs,
  v.

RICHARD J. SAMSON, as Chapter 7 Trustee
to the Estate of Edra Blixseth; DEBTOR EDRA
BLIXSETH; OPSPRING LLC; BLXWARE, LLC;
JULIE BARVE; MATTHEW CROCKER; and
ERIK BERGSAGEL,

    Defendants.

Adv. Pro. No. 09-00105
(The Honorable Terry L. Myers)

**THIRD PARTY DEFENDANT
MICHAEL SANDOVAL'S TRIAL
BRIEF**

WESTERN CAPITAL PARTNERS LLC,
a Colorado limited liability company,

  Third Party Plaintiff,

  v.

MICHAEL SANDOVAL, xPATTERNS LLC, and
ATIGEO LLC,

  Third Party Defendants.

## I.     __INTRODUCTION__

Third Party Defendant Michael Sandoval respectfully requests that the Court find in his favor on all of Western Capital Partners' ("WCP") claims against him. WCP's claims against Sandoval are based on Sandoval's personal guaranty of a loan that Debtor Edra Blixseth made to xPatterns' LLC, a software company of which Sandoval was a director and CEO at the time. This guaranty is contained in a Letter Agreement Blixseth and Sandoval signed, among others. WCP purchased Blixseth's claims against Sandoval. The uncontroverted evidence will show that Blixseth and her related parties repeatedly failed to perform their own obligations under the Letter Agreement, many of which would have provided funds to pay down the xPatterns' loan that Sandoval guaranteed or otherwise assisted xPatterns to generate money.

The intent of the parties when entering into the Letter Agreement could not have been that the Blixseth parties would not have to perform their obligations, while Sandoval would be required to pay his guaranty. Indeed, the terms of the Letter Agreement show interdependent obligations, where Blixseth's own obligations would be used to pay down the loan Sandoval had guaranteed. Excusing the Blixseth parties from their obligations, while still forcing Sandoval to pay the guaranty, would make the Blixseth parties' promises illusory.

Throughout this litigation, WCP has argued that language in the Letter Agreement that Sandoval would pay the loan guaranty "no matter what may happen" meant that Sandoval had to guaranty the loan even if Blixseth failed in her many obligations. *See, e.g.,* Dkt. No. 417 at 4-5. But this is, in fact, the hornbook definition of an illusory contract. Specifically, *Williston* has used the exact phrase "no matter what may happen" to describe an illusory contract, stating that an illusory contract is not an enforceable contract because the illusory language "makes performance optional with the promisor no matter what may happen, or no matter what course of conduct in other respects the promisor may pursue[;] it does not justify the promissee in understanding that a commitment has been made." *Hegel v. Brusnwick Corp.*, No. 09-C-882, 2010 WL 4068490, at *1 (E.D. Wis. Oct. 15, 2010) (quoting Richard A. Lord, *Williston on Contracts* § 1.2, at 11 (4th

1

ed.1990)) (emphasis added). If Blixseth was able to breach her obligations, while still requiring Sandoval to guaranty the loan, Blixseth's promise was illusory. Accordingly, the Court cannot interpret the Letter Agreement in the way WCP seeks.

Because of Blixseth's repeated failure to perform, the Letter Agreement has been repudiated, excusing Sandoval's personal guaranty. Further, the Debtor's Estate failed to assume the Letter Agreement within 60 days of an order for relief, as required by 11 U.S.C. § 356(d). This further breach occurred before WCP purchased the claims under the Letter Agreement. Because WCP cannot recover under the Letter Agreement or its accompanying promissory note, judgment should be entered against WCP and its claims against Sandoval dismissed with prejudice.

## II. <u>STATEMENT OF FACTS</u>

### A.    The Atigeo Parties, the Blixseth Parties, and the Letter Agreement.

Sandoval served as a director and the CEO for three affiliated software development and sales companies, Atigeo LLC (f/k/a AziMyth LLC) and its subsidiaries xPatterns LLC (collectively with Sandoval, the "Atigeo Parties") and Opspring LLC. Blixseth invested $10 million in xPatterns and served as xPatterns' other director. Blixseth's $10 million investment was an equity position only. As xPatterns' directors, Sandoval and Blixseth authorized Sandoval to take a loan in excess of $5 million from xPatterns to purchase certain real property in the Summer 2006.  Contemporaneous emails and other documents show that Blixseth fully blessed Sandoval borrowing the $5 million, which he ultimately repaid to xPatterns. Indeed, Blixseth wired the $5 million directly to Sandoval.

Blixseth also invested $8 million in Opspring LLC, an Atigeo subsidiary. Sandoval was CEO and Director of Opspring and Blixseth was the other Director. Opspring, in turn, hired an individual named Dennis Montgomery, who previously worked for eTreppid Technologies LLC.

In 2006, eTreppid instituted litigation ("eTreppid litigation"), alleging that Montgomery had interfered with eTreppid's business and trade secrets.

### 1) The Letter Agreement.

In March 2007, Sandoval and Blixseth agreed to end their business relationship by executing a letter and promissory note (together "Letter Agreement"). Although there were a number of parties to the Letter Agreement, the contract had essentially two sides, the Atigeo Parties (Atigeo, xPatterns, and Sandoval) and the Blixseth Parties (Blixseth, her family, and Opspring). Under the terms of the Letter Agreement:

- At Blixseth's insistence, Blixseth's $10 million equity investment in xPatterns was converted to an installment loan repayable by note. Blixseth provided <u>no new money</u> as a result of the Letter Agreement. Letter Agreement §1.

- Sandoval granted xPatterns a security interest in the property purchased with the loan from xPatterns, and xPatterns agreed to maintain that interest until it satisfied the first $2 million of the debt owed to Blixseth. *Id.* §2.

- Sandoval personally guaranteed repayment of the first $5 million that xPatterns owed to Blixseth under the newly created installment loan. Specifically, Section 2 of the Letter Agreement provides: "By signing this Letter Agreement, Michael Sandoval ("Sandoval") guarantees to the Blixseth Family that the first $5 million portion of the xPatterns Obligations will be paid when due, no matter what may happen." *Id.*

- Atigeo and Sandoval relinquished all interests and control in Opspring, leaving Blixseth and certain of her family members as the sole owners of Opspring, in exchange for the promise that Blixseth and her relatives would cause Opspring to pay xPatterns' parent company Atigeo a quarterly <u>performance fee</u> based on revenue earned by Opspring and its "affiliates, successors and assigns that are involved in Opspring's business (e.g., affiliated entities formed to provide various functions, such as sales, distribution, development, etc.) and their revenue." The first $5 million of the performance fee would be used to cover or reduce xPatterns' note to Blixseth. *Id.* §4.

- Opspring agreed to <u>defend and indemnify</u> Atigeo, xPatterns, and Sandoval in connection with the then-ongoing eTreppid litigation and any other litigation arising out of Dennis Montgomery's involvement. *Id.* §11.

- The Blixseth Parties would cause the Yellowstone Club to pay xPatterns' parent company Atigeo $1 million and assume or pay for a $543,000 Atigeo obligation to Microsoft Licensing. *Id.* §9.

- The parties agreed (1) <u>not to disclose</u> the Letter Agreement's terms, (2) <u>to keep confidential</u> the other parties' trade secrets and confidential information, and (3) <u>not to disparage</u> each other. Underscoring the importance of those terms, the parties agreed that any violation of those terms would entitle the injured party to injunctive relief. *Id.* §§ 22, 23.

- The parties agreed to <u>return all property</u> belonging to each other. *Id.* §25.

- The parties <u>released</u> all claims and causes against one another. *Id.* §14.

The above-listed promises were fundamental to the Letter Agreement. No party would have entered into the Letter Agreement without the exchange of promises and corresponding performance of obligations. The evidence at trial will show that the intent of the parties was not that Sandoval would be required to pay the guaranty even if the Blixseth Parties failed to perform most of their side of the bargain. Rather, the Letter Agreement was designed in a manner where the xPatterns' loan was to be repaid through a number of mechanisms, such as the payment of the performance fee. *See* Letter Agreement § 4. Indeed, the first $5 million of the performance fee (corresponding to Sandoval's guaranty) was to be paid to the Blixseth family directly and used to reduce the Note Sandoval had guaranteed. *Id.* The "no matter what may happen" language of Sandoval's guaranty meant that even if this mechanism was insufficient to fund the full amount of the xPatterns loan to repay its obligation, Sandoval would be responsible for the loan. That language was never intended to make the Blixseth Parties' obligations under the Letter Agreement illusory.

*2)   The Blixseth Parties Repeatedly Failed to Perform Under the Letter Agreement.*

Sandoval repaid to xPatterns all the funds, plus interest, he borrowed from xPatterns. Likewise, xPatterns satisfied its obligation regarding the first $2 million owed to Blixseth under the installment loan as required. In contrast, the Blixseth Parties repeatedly and immediately failed to perform under the Letter Agreement by:

- despite Opspring and/or its successor/affiliate Blxware[1] earning <u>at least</u> $2.5 million in revenue, failing to cause Opspring to pay <u>performance fees</u> to Atigeo owing under the Letter Agreement;

- failing to <u>defend and indemnify</u> Sandoval, Atigeo and xPatterns in connection with the eTreppid and other litigation, which cost the Atigeo Parties more than $897,000;

- failing to have the Yellowstone Club pay $1 million to Atigeo or assume or pay for the $543,000 Atigeo obligation to Microsoft Licensing; Atigeo owed xPatterns over $2 million, so the $1 million could have gone directly to xPatterns to help repay the Blixseth loan;

- <u>publicly disclosing</u> the full terms of the Letter Agreement in a lawsuit in May 2008 in Washington state court <u>and failing to keep confidential</u> the Atigeo Parties' trade secrets and confidential information; and

- failing to <u>return all property</u>, including confidential information and trade secrets, belonging to Atigeo and xPatterns.

It must not be forgotten that at the time of the Letter Agreement was executed, Atigeo owed xPatterns more than $2 million of intercompany obligations.  Hence, the obligations owed to Atigeo were expected to directly benefit xPatterns by the parent-subsidiary intercompany accounting entries.  Because of all these failures, in September 2008, Atigeo and xPatterns brought claims against the Blixseth Parties in Washington state court for breaching the Letter Agreement.

**B.      The Trustee Failed to Assume the Letter Agreement.**

In March 2009, Blixseth filed for relief under Chapter 11 of the Bankruptcy Code. The Court ordered the case converted from Chapter 11 to Chapter 7 on May 29, 2009 (the "Conversion Date"). The Trustee then failed to assume the Letter Agreement within 60 days after the Conversion Date (July 28, 2009, the "Deemed Rejection Date"), as required by 11 U.S.C. §365(d) for executory contracts.

---

[1] In her July 19, 2011 affidavit, Blixseth acknowledged that Blxware LLC is a "successor in interest" to Opspring and that "Opspring, and its affiliates, successors and assigns, earned revenue from business operations, including via a government contract" but xPatterns was not paid any performance fee. Dkt. No. 400-3 at 12 ¶11. Blxware's managing director, Nickolas Rhodes, also testified in deposition that Blxware is the successor in interest to Opspring.

**C.      The Adversary Proceeding.**

On October 2, 2009, Atigeo and xPatterns filed unliquidated proofs of claim against the Estate. Claims 75-1, 76-1. Each proof of claim specified that the claims of Atigeo and xPatterns against the Estate were based on, *inter alia*, causes of action asserted in the Washington state court litigation for breach of contract. *Id.* The Estate did not accept the proofs of claim upon filing.

On December 7, 2009, Atigeo and xPatterns as Plaintiffs filed this adversary action against, *inter alia*, Blixseth, her Bankruptcy Estate/Trustee, and the Blixseth Parties. Dkt. No. 1. In the complaint, Atigeo and xPatterns sought alternative forms of relief on their claims that the Blixseth Parties had violated the Letter Agreement including claims for, *inter alia*, "declaratory judgment rescinding a contract." *Id.* at 1-2 (emphasis added). Specifically, in Count I, Atigeo and xPatterns sought a declaratory judgment that the Blixseth Parties had "repudiated their responsibilities" under the Letter Agreement, causing the Letter Agreement to "fail[ ] in its essential purpose" and rendering it "unenforceable." *Id.* at 9. Atigeo and xPatterns are no longer going concerns and it is unknown if they will be participating in this trial.

**D.      WCP's Involvement in the Adversary Action.**

On March 9, 2010, WCP (a privately owned bridge lender specializing in loans to distressed entities) became involved in this matter by filing a "Notice of UCC Public Sale." Bankr. Dkt. No. 653, 662. In that notice, WCP claimed that it had a perfected security interest in "[a]ll accounts receivable and/or contract rights of Edra D. Blixseth" relative to the Atigeo Parties and that it planned to sell such interests on March 22 under U.C.C. Article 9. *Id.* On March 19, 2010, after receiving such notice, Atigeo and xPatterns filed in the main bankruptcy case a *notice* specifically explaining that Count I of the adversary complaint would have a potential negative impact on the property in the U.C.C. sale by rendering the Letter Agreement void and unenforceable. Bankr. Dkt. No. 664. With full knowledge of Count I, WCP foreclosed on its security interest by placing a credit bid of

6

$250,000 for the bundled interest in the Letter Agreement accounts receivable *together with* numerous other Estate assets. Bankr. Dkt. No. 673.

On March 30, 2010, the Court granted WCP leave to intervene as a third-party plaintiff in this adversary action. Dkt. No. 64. Subsequently, the Estate voluntarily dismissed its third-party complaint against the Atigeo Parties.[2] Dkt. No. 143, 147. On November 3, 2010, WCP invoked the bankruptcy court's subject matter jurisdiction and filed an *Answer* and *Third-Party Complaint* against Atigeo, xPatterns and Michael Sandoval for breach of the Letter Agreement. Dkt. No. 154. Specifically, WCP contends that Sandoval breached the Letter Agreement by (1) failing to pay the Blixseth Parties the money he personally guaranteed; and (2) xPatterns releasing its security interest on Sandoval's property. *Id.*

On May 23, 2011, the Court granted WCP leave to file a First Amended Complaint, adding claims against Atigeo. Dkt. No. 193, 213. On June 10, 2011, Sandoval answered the First Amended Complaint, stating as an affirmative defense that WCP's "claims against Sandoval are barred, in whole or in part, by Blixseth prior breaches of the Letter Agreement" and "because Blixseth failed to perform as required under the Letter Agreement." Dkt. No. 229 at 8. WCP has consistently taken the position that it is only a creditor of Blixseth — *i.e.*, that WCP has no obligations to perform under the Letter Agreement.

### III. <u>ARGUMENT</u>

**A.    Burden and Applicable Law.**

Pursuant to Section 29 of the Letter Agreement, California law governs the Letter Agreement, without resort to California conflict of laws provisions or rules. Under California law,

---

[2] As a result of dismissal, the Trustee has no claims pending against Michael Sandoval, Heather Sandoval, or HMJZ, LLC in this adversary proceeding. WCP has not asserted claims against either Heather Sandoval or HMJZ, LLC.

WCP must prove the following elements by a preponderance of the evidence: (1) the contract, (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damage to plaintiff. *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830, 442 P.2d 377, 381 (1968). Repudiation/failure of consideration/Blixseth's material breach are affirmative defenses that Sandoval must prove by preponderance of the evidence. (e) [§ 1092] Plaintiff's Default or Defendant's Excuse., 5 Witkin, Cal. Proc. 5th Plead § 1092 (2008); *Ettinger v. Bd. of Med. Quality Assurance*, 135 Cal. App. 3d 853, 855, 185 Cal. Rptr. 601, 603 (Ct. App. 1982).

Here, WCP cannot meet ***its burden*** that it, or standing in Blixseth's shoes, has performed all of the obligations under the Letter Agreement. Rather, it is undisputed that the Blixseth Parties repeatedly breached the terms of the Letter Agreement and failed to perform material terms. Nor is there any evidence that WCP cured those non-performances.  Those breaches are indivisible from Sandoval's guaranty. As a result, not only cannot WCP affirmatively prove the required elements of its breach of contract claims, but Sandoval repudiation defense is proven. Further, because the Debtors' Estate failed to assume the Letter Agreement within 60 days of an order for relief, as required by 11 U.S.C. § 365(d), such failure is a further material breach/repudiation by the Debtor. Accordingly, for both of these independent reasons, judgment should be granted in favor of Sandoval on WCP's claims.

**B.     The Blixseth Parties' Breaches are Indivisible from Sandoval's Guaranty.**

In summary judgment briefs, WCP argued that (1) Sandoval's guaranty is divisible from Blixseth's obligations; (2) the Letter Agreement is not a fully, bilateral contract; and (3) accordingly, the Letter Agreement was not an executory contract that had to be assumed under 11 U.S.C. §365(d). Dkt. Nos. 398, 406, 417. Each of these arguments fails. As described below, Sandoval's guaranty cannot be divided from Blixseth's obligations and the Letter Agreement is a bilateral and executory contract that the Trustee failed to assume timely under 11 U.S.C. § 365(d).

Sandoval's guaranty cannot be divided from the Blixseth Parties' breached obligations. "[T]he test of whether a contract is divisible is that if the consideration is single, the contract is

entire, but if the consideration is apportioned, the contract may be regarded as severable. And a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes." *Simmons v. California Inst. Of Tech.*, 34 Cal.2d 264, 275 (Cal. 1949). Under California law, the question whether obligations are severable is a "question of the parties' intent based upon the substance and language of the agreement at issue." *In re Pollock*, 139 B.R. 938, 940 (B.A.P. 9th Cir. 1992) (applying California law). Here, Section 1 of the Letter Agreement expressly states its own consideration:

> All interests of the Blixseth Family in xPatterns shall hereby be redeemed by xPatterns for consideration consisting of (i) $2 million payable by xPatterns to Edra Blixseth on behalf of the Blixseth Family within one hundred and twenty (120) days of the date hereof, and (ii) the issuance by xPatterns to Edra Blixseth on behalf of the Blixseth Family of an $8 million unsecured note payable $1 million at the end of two years, $2 million at the end of the three years and the balance bearing interest at a rate of 8% compounded quarterly (collectively the "xPatterns Obligations.").

Letter Agreement §1 (emphasis added). Sandoval's guaranty is notably absent here from the express consideration for the conversion of Blixseth's equity interest to debt. Thus, Sandoval's guaranty must be in consideration for, and indivisible from, the remainder of the agreement, including the Blixseth Parties' obligations running specifically to Sandoval and the other Atigeo Parties.

At trial, the evidence will show that the parties intended that the guaranty was not divisible from the rest of the contract. The interdependency of the Letter Agreement is reflected when reviewing Sections 2 and 4 of the Letter Agreement. Section 2 contains Sandoval's guaranty of the first $5 million of the xPatterns obligations. Section 4 requires Opspring (then controlled and owned by Blixseth) to pay a performance fee to Atigeo, but the first $5 million of this performance fee (corresponding to the amount of Sandoval's guaranty) is paid to the Blixseth family to reduce

the portion of the Note that Sandoval guaranteed.[3] Similarly, the Blixseth Parties had to pay or cause to pay $1 million to xPatterns' parent corporation and more than $897,000 in indemnification costs to xPatterns, Atigeo, and Sandoval. By failing to satisfy their obligations to xPatterns and its related parties, the Blixseth Parties materially inhibited xPatterns' ability to repay all the money Sandoval guaranteed.

WCP's argument is that somehow Section 4 and all other Blixseth Party obligations to pay money to the Atigeo Parties (such as the $1 million payment and indemnification) are divisible from Section 2, such that Blixseth could refuse to pay money meant to pay down Sandoval's guaranty, while still requiring Sandoval to pay the guaranty. In fact, these terms cannot be divided.

To the extent WCP may argue that the Blixseth Parties' obligations were independent covenants divisible from Sandoval's guaranty, California has rejected that outdated approach when, as here, there has been a material breach of contract. *Flagship W., LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1009–11 (E.D. Cal. 2010), *aff'd sub nom. Flagship W. LLC v. Excel Realty Partners LP*, 534 F. App'x 659 (9th Cir. 2013). Specifically, in *Flagship*, the court refused to conduct an analysis into whether a covenant was "independent" when the jury had made a finding that the breach was material, noting that independent covenants are, by nature, not material. *Id*. Stated similarly, the independent/dependent covenant analysis is an outdated approach to analyzing bilateral contracts, as recognized by leading commentary:

> The modern rule … adopts a presumption that mutual promises—that is, promises in a bilateral contract—are dependent and are to be so regarded whenever possible. The significance of this modern approach is straightforward: If the promises are

---

[3] WCP has argued that §3 of the Letter Agreement stating that "The xPatterns Interests shall be cancelled and the Blixseth Family, and each of them, shall have no further obligations to or interest in xPatterns" meant that xPatterns' obligations became unilateral. *See* Dkt. No. 417 at 3. This interpretation of the Letter Agreement ignores the numerous Blixseth Party obligations to xPatterns stated in the Letter Agreement, including paying the performance fee to reduce xPatterns' debt (§4); requiring Opspring to indemnify xPatterns (§11); releasing claims against xPatterns (§14(b)); keeping xPatterns' trade secrets and proprietary information confidential (§22); not disparaging xPatterns (§22); and causing Opspring to return xPatterns' and Atigeo property (§25).

dependent in this sense, a party's failure to perform one of the mutual promises it made bars its right to recover because of the breach since, when there is a substantial breach of a material, dependent covenant in a contract, the innocent party is excused from further performance.

§ 44:5.A general statement of the modern rules, 15 Williston on Contracts § 44:5 (4th ed.) *See also Brown v. Grimes*, 192 Cal. App. 4th 265, 277-80, 120 Cal. Rptr. 3d 893 (2d Dist. 2011) (rejecting plaintiff's argument that his breach was of an independent covenant and recognizing that material breach excuses the other party's performance).

In addition, the Letter Agreement's severability clause does not render Sandoval's guaranty divisible from Blixseth's obligations. The Letter Agreement's severability clause provides that if any provision of the Letter Agreement is deemed "invalid or unenforceable," the remainder of the agreement "shall not be affected." Letter Agreement §28. This provision is not evidence of the parties' intent that the Letter Agreement is divisible for *breach*. Williston has explained this distinction as follows:

> It has … been said that it cannot reasonably be maintained that a severability clause providing that '[i]f any provision of this contract is void or unenforceable, it shall in no way affect any other provision of the contract or its validity or enforceability' applies to an event such as a breach and, therefore, that the presence of a severability clause in a contract does not affect the determination whether the parties intended to create a divisible contract."

§ 45:6. Intention of parties; express terms of contract—Effect of severability or cancellation clause, 15 Williston on Contracts § 45:6 (4th ed.) (quoting *Budge v. Post*, 544 F. Supp. 370 (N.D. Tex. 1982)). Because the Letter Agreement's severability clause only addresses the scenario where a term is deemed invalid, not breached, it is not evidence of the parties' intent to make the contract divisible for breach.

## C.    The "No Matter What May Happen" Language is Illusory.

Contracts should not be interpreted in a manner that renders them illusory. *See Chevron U.S.A., Inc. v. Bragg Crane & Rigging Co.*, 180 Cal. App. 3d 639, 646, 225 Cal. Rptr. 742, 746 (Ct. App. 1986). WCP's argument that Sandoval's guaranty "no matter what may happen" requires Sandoval to perform even where the Blixseth Parties wholly failed to perform their obligations

would render the Letter Agreement an illusory contract. As stated above, Williston has used the exact phrase "no matter what may happen" to describe an illusory contract, stating that an illusory contract is not a contract because the illusory language "makes performance optional with the promisor no matter what may happen…" *Hegel v. Brusnwick Corp.*, No. 09-C-882, 2010 WL 4068490, at *1 (E.D. Wis. Oct. 15, 2010) (quoting Richard A. Lord, *Williston on Contracts* § 1.2, at 11 (4th ed.1990)). Accordingly, WCP's interpretation that Sandoval had to perform his contract even though the Blixseth Parties failed to perform their obligations is the hornbook definition of an illusory contract.

**D.   The Blixseth Parties' Failure to Perform Material Provisions of the Letter Agreement Established Repudiation.**

Under California law, a contract may be repudiated and the parties restored to their pre-contract positions when (A) there is a material breach or (B) there is a total failure of consideration. Each circumstance is discussed here.

> *i.    The Blixseth Parties Rescinded the Letter Agreement by Their Material Breaches Prior to Debtor's Bankruptcy.*

A "party anticipatorily breaches a contract expressly by unequivocally refusing to perform, or impliedly by conduct 'where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible.'" *County of Solano v. Vallejo Redevelopment Agency*, 75 Cal. App. 4th 1262, 1276 (1999) (quoting *Taylor v. Johnston*, 15 Cal. 3d 130, 137, 539 P.2d 425 (1975)). A party who commits a partial breach of a contract and then follows that breach with a repudiation of his remaining contract duties commits a total breach of the contract, which excuses the non-breaching party's performance and entitles him to rescission of the contract. *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 29, 142 P.2d 22 (1943); *Fox v. Dehn*, 42 Cal. App. 3d 165, 171 (1974).

When a contracting party fails to perform an obligation that constitutes a material breach, the contract is repudiated, and the other party may be discharged from its duty to perform under the contract. *Taylor*, 15 Cal.3d at 137; *Brown v. Grimes*, 192 Cal. App. 4th 265, 277, 120 Cal.

Rptr. 3d 893 (2011). Materiality "depends on the importance or seriousness [of the breach]." *Id.* at 278 (internal quotation marks and citations omitted). One consideration in assessing materiality is the "probability of the injured party getting substantial performance." *Id.* at 278. Importantly, "if a party has materially breached any portion of [even] a divisible contract, the aggrieved party is excused from further performance of all uncompleted portions of the contract." *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 79 Cal. App. 4th 852, 861, 94 Cal. Rptr. 2d 438, 444 (2000), as modified (Apr. 6, 2000) (emphasis added). Thus, the ultimate question is not whether the Letter Agreement is divisible, but rather whether the Blixseth Parties' breach was material.

At trial, the evidence will conclusively establish that the Blixseth Parties committed multiple material violations of the Letter Agreement. For example, once the Blixseth Parties published the terms of the Letter Agreement in the Washington state court litigation and failed to respect the confidentiality and proprietary nature of Atigeo's and xPatterns' trade secrets, those promises were incapable of being fulfilled. Additionally, the Atigeo Parties suffered substantial economic harm from the Blixseth Parties' non-performance, including at least $897,000 in legal costs from the eTreppid and other litigation, resulting from the Blixseth Parties' breach of their duties to indemnify and defend the Atigeo Parties. Similarly, the Blixseth Parties failed to require the Yellowstone Club to pay $1 million to Atigeo or assume or pay for Atigeo's $543,000 obligation to Microsoft Licensing.

The Blixseth Parties further materially breached the agreement by not paying any performance fee or using any performance fee obligation to reduce the xPatterns note. The evidence will show that Opspring's successor-in-interest/affiliate Blxware obtained money from a government contract that should have resulted in the payment of a performance fee to pay down the xPatterns' debt.[4]

---

[4] California and Washington (where Opspring and Blxware operated) apply the same test for whether a corporate successor-predecessor relationship exists. Specifically, such a relationship exists when the successor acquires "substantially all" of the predecessor's assets. *See, e.g.*, Cal. Lab. Code § 2502(a), (g) (defining a "successor grocery employer" as the acquirer of "substantially

The Blixseth Parties cannot go back in time and satisfy those obligations now. Given the Blixseth Parties' actions, the Letter Agreement is repudiated in its entirety and the Atigeo Parties (specifically, Sandoval here) are relieved of any obligation to perform under it. *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011) ("When a party's failure to perform a contract obligation

---

all [] assets" of the predecessor, in the context of labor regulations); Cal. Rev. & Tax Code § 18669(d) (defining the California Franchise Tax Board's remedies against entities that acquire "substantially all the assets" of another entity as being the same as against the latter); Cal. Unemp. Ins. Code §§ 1051, 3254.5 (similarly using the "substantially all [] assets" standard in the context of unemployment insurance); Cal. Ins. Code § 716 (in the context of insurance certificates); Cal. Bus. & Prof. Code § 20029 (franchises). So does the Washington statutory framework. *See, e.g.*, WAC 192-350-010.

Similarly, within the context of the *de facto* merger doctrine, California and Washington both define successors as entities that have acquired substantially all the alleged predecessor's assets. *See generally*, *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wash. 2d 403, 645 P.2d 689 (1982); *Payne v. Saberhagen Holdings, Inc.*, 147 Wash. App. 17, 190 P.3d 102 (Div. 1, 2008); *McClellan v. Northridge Park Townhome Owners Assoc.*, 89 Cal.App.4th 746, 754 (2001) ("corporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old"); *Franklin v. USX Corporation*, 87 Cal. App.4th 615, 621-22 (2001). Further, the jurisdictions both adopted the minority rule, expanding the successor-predecessor definition, that corporations operating in the same product line and using the same goodwill are in a successor-predecessor relationship. *Ray v. Alad Corp.*, 19 Cal. 3d 22, 560 P.2d 3 (1977) (articulating the doctrine); *Martin v. Abbott Labs.*, 102 Wash. 2d 581, 609–10, 689 P.2d 368 (1984) (adopting the doctrine).

Here, Blxware is the successor to Opspring, or at least an affiliate. Opspring LLC was a Washington corporation that came into existence in Bellevue on March 23, 2006, went out of good standing on March 31, 2009, and was dissolved July 1, 2009. Blxware, LLC is a Delaware corporation that was formed on December 4, 2007 to continue the operations of Opspring. The Blxware personnel Mr. Sandoval worked with in the wake of the Letter Agreement were the same as Opspring's former personnel. This includes key personnel, like Dennis Montgomery. Blxware and Opspring shared the same physical real estate space. They engaged in the same product line. They even enjoyed the same goodwill: Blxware acquired a $2M deal that Opspring had been negotiating before Ms. Blixseth separated her business from Mr. Sandoval's. Both companies leveraged the same set of operative assets (technology), including substantially all Opspring's former assets (intellectual property). With the exception of Mr. Sandoval, the principals of Blxware were the same as the principals of Opspring. And indeed, when Opspring was a dissolved corporation, WCP claimed Blxware had an ownership interest in Opspring. Dkt. No. 193-1 (WCP's April 6, 2011 amended complaint). Opspring had no meaningful identity, after the Letter Agreement, separate from Blxware, and Opspring became defunct shortly thereafter. Thus, Blxware is the successor to Opspring, or at least an affiliate.

constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."); *Sackett v. Spindler*, 248 Cal. App. 2d 220, 229 (1967) (where the breach is total, the non-breaching party is entitled to repudiate the entire contract).[5]

ii.    *The Blixseth Parties Rescinded the Letter Agreement by Their Material Failures of Performance Prior to Debtor's Bankruptcy.*

A contract is repudiated and the injured party is excused from performance if the consideration the injured party was to receive failed through the fault of the breaching party. *See* Cal. Civ. Code § 1689(b)(2), § 1439 (stating that before any party to an obligation can require another party to perform any act under it, the party must fulfill *all conditions precedent* thereto imposed upon itself); *see also Crofoot Lumber, Inc. v. Thompson*, 163 Cal. App. 2d 324, 333, 329 P.2d 302 (1958) (upholding rescission where nonperforming party violated every obligation assumed); *Mussler v. Nash*, 118 Cal. App. 2d 494, 495, 258 P.2d 108 (1953) (holding that bankruptcy and foreclosure resulted in complete failure of consideration excusing performance). Economic damages are not "essential" to warrant rescission. *Wilson v. Corrugated Kraft Containers, Inc.*, 117 Cal. App. 2d 691, 697, 256 P.2d 1012 (1953) (upholding judgment in favor of party seeking termination of agreement); *see also Brown*, 192 Cal. App. 4th at 276–77 (holding that failure to pay a third party was a material breach excusing performance). Applying long-standing California law, the Atigeo Parties were excused from performance under the Letter Agreement because the Blixseth Parties breached multiple material provisions.

Upon repudiation of an agreement via failure of consideration or material breach of contract, a party's legal obligations thereunder are rescinded and the agreement is void *ab initio*.

---

[5] WCP may argue that Washington law applies to determine repudiation of the Letter Agreement because the Letter Agreement was executed in Washington State. Assuming *arguendo* that were true, the analysis under Washington law would mirror the analysis under California law. Under Washington law, as under California law, if one party to a contract makes a "positive statement or action indicating distinctly and unequivocally that the repudiating party will not substantially perform his contractual obligations," the contract is repudiated. *Lovric v. Dunatov*, 18 Wn. App. 274, 282, 567 P.2d 678 (1977). When that occurs, "repudiation by one party will excuse performance by the injured party." *Turner v. Gunderson*, 60 Wn. App. 696, 703, 807 P.2d 370 (1991). *See also Hemisphere Loggers & Contractors, Inc. v. Everett Plywood Corp.*, 7 Wn. App. 232, 234, 499 P.2d 85, *review denied*, 81 Wn.2d 1007 (1972) ("Repudiation of a contract by one party may be treated by the injured party as a breach which will excuse his own performance.").

*See Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 29, 142 P.2d 22 (1943) (explaining that under California law, one who commits a partial breach of a contract and then follows that breach with the repudiation of remaining contract duties commits a total breach of the contract, which excuses the non-breaching party's performance and entitles him to rescission of contract).

It is important to note that where, as here, there has been a total failure of consideration, a repudiation is warranted *even in the absence of economic harm*. Under California law, the Letter Agreement is repudiated and Sandoval is excused from further performance, if the consideration the Atigeo Parties were to receive failed through the fault of the Blixseth Parties. *See* Cal. Civ. Code § 1689(b)(2) and § 1439 (stating that before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself). A failure of consideration does not require evidence of economic damages:

> *The existence of financial detriment . . . is not essential in order to excuse his further performance. A willful default may be material though no economic loss ensues.* The occurrence of a failure of consideration resulting from the willful failure of plaintiffs to perform an integral part of an entire contract is sufficient to entitle defendant to cancel.

*Wilson v. Corrugated Kraft Containers, Inc.*, 117 Cal. App. 2d 691, 697 (1953) (emphasis added) (citations omitted) (upholding judgment in favor of party seeking termination of agreement where other party breached the contract by purchasing products from another party and thus there was a failure of consideration). *See also Brown v. Grimes*, 192 Cal. App. 4th 265, 276-277 (2011) (holding that failure to pay a third party was a material breach excusing performance by other party); *Mussler v. Nash*, 118 Cal. App. 2d 494, 495 (1953) (holding that bankruptcy and foreclosure resulted in complete failure of consideration excusing contracting party from further performance).

Similarly, in *Crofoot Lumber, Inc. v. Thompson*, 163 Cal. App. 2d 324 (1958), the California Court of Appeals held that there was a complete failure of consideration where the defendant repeatedly breached the provisions in the contract:

> From the beginning the purchasers breached not only the obligations to harvest and pay for the timber, but also the implied obligations of honorable, fair conduct toward their seller. The entire course of conduct immediately adopted and

16

continuously sustained was violative of every obligation they had assumed. The trial court … was much impressed with the complete infidelity of [Defendant] Thompson in respect of his obligations, and we think no one can read the record and not be likewise impressed.

Said the trial court: "... Mr. Thompson has not lived up to a single term of the contract, brief as it is…. Each one of these breaches went to the very roots of the contract and constituted a material violation thereof and ***each*** constituted a ground for rescission."

*Id.* at 333. According to long-standing law, Sandoval (and the Atigeo Parties) was excused from performance under the Letter Agreement long before Blixseth filed for bankruptcy and WCP succeeded to Blixseth's contractual rights. In light of the undisputed, corroborated evidence, the Letter Agreement should be held void and unenforceable as a matter of law, including Sandoval's guaranty and any requirement for xPatterns to hold a security interest on Sandoval's property

### E.   Sandoval is not Required to Restore WCP or Blixseth to their Pre-Letter Agreement Positions.

WCP has argued that Sandoval must restore WCP to Blixseth's original position in order to rescind the Letter Agreement. Dkt. No. 406 at 3. California Civil Code § 1691 requires that a party seeking rescission "[r]estore to the other party everything of value which <u>he has received</u> from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so." (Emphasis added). First, Sandoval himself has not "received" anything from the Blixseth Parties under the Letter Agreement. That is one of the main reasons he argues that there should be rescission because there has been a total failure of consideration by the Blixseths. *Russell v. Roscoe*, 106 Cal. App. 293, 299, 289 P. 185, 188 (Cal. Ct. App. 1930) ("there was a complete failure of consideration, which fact in itself would likewise obviate the necessity of any offer to restore."). Accordingly, Sandoval cannot restore to WCP "everything of value which he has received." Cal. Civ. Code §1691. Sandoval did not receive what he was promised.

Second, there is nothing to restore to WCP or the Blixseth Parties from xPatterns' loan. Blixseth exchanged xPatterns equity for the debt that is the subject of the Letter Agreement. *See*

Letter Agreement §1. That stock is now worthless as WCP has previously acknowledged. Dkt. No. 406 at 18 ("xPatterns is now a worthless and a dissolved entity."). "[T]he consideration, as a general rule, need not be returned or tendered when it is of no value at the time of bringing suit." 12A C.J.S. Cancellation of Inst. § 91 (citing *Dunn v. Stringer*, 41 Cal. App. 2d 638, 646, 107 P.2d 411, 416 (1940) ("where the thing involved in a rescission suit has no value to either of the parties it is not necessary, as a prerequisite to the cancellation of a contract, to restore the property.").

**F.     Sandoval, as Guarantor, has the same Defenses as xPatterns.**

As a guarantor, Sandoval may avail himself "of all defenses that would be allowed the principal," xPatterns. *Flickinger v. Swedlow Engineering Co.,* 45 Cal. 2d 388, 394 (1955) (holding that "any right which plaintiff might have had to recover upon the bond was necessarily dependent upon plaintiff's right to recover upon his contract with" the principal). Thus, Sandoval can assert the same defenses asserted by xPatterns. In particular, California law provides that the failure of a party to perform under a contract excuses the other parties' performance and, most pertinent to these facts, parties may <u>not</u> by the terms of their contract waive this rule:

> The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:
>
> 1. When such performance or offer is prevented or delayed by the act of the creditor [Blixseth], or by the operation of law, even though there may have been a stipulation that this shall not be an excuse… .

Cal. Civ. Code § 1511(1). Further, under long-standing case law, California courts construe the term "prevent from performance" very broadly:

> The same language — i.e., that the party suing must be "prevented" from performance, has been used in numerous cases, but wherever the attention of the court has been directly called to the sense in which the word has been used, it has been held not to mean that there must be physical prevention, <u>but that any acts, conduct or declarations of the party evincing a clear intention to repudiate the contract and to treat it as no longer binding are a legal prevention of performance</u>.... [W]here one party to an executory contract refuses to treat it as subsisting and binding upon him, or by his acts and conduct shows that he has renounced it and no longer considers himself bound by it, there is, in legal effect, a prevention of performance by the other party, and it can make no difference whether the contract

> has been partially performed or the time for performance has not yet arrived; nor is
> it important whether the renunciation be by declaration of the parties that he will
> be no longer bound, or by acts and conduct which clearly evince that that
> determination has been reached and is being acted upon.

*Alderson v. Houston*, 154 Cal. 1, 11 - 12 (1908) (internal citations omitted). Thus, the Letter Agreement's "no matter what may happen" clause does not waive any Atigeo Parties' right to suspend performance under the Letter Agreement and under the Note in the wake of the Blixseth Parties' repeated failures to perform. In other words, as the Letter Agreement is repudiated, so too are all of its terms and instruments, including the personal guaranty by Sandoval.

**G.    The Promissory Note is Note a Negotiable Instrument**

To date, WCP has not argued that the Promissory Note here is not a negotiable instrument. As explained in more detail in Sandoval's Motion for Summary Judgment (Dkt. No. 400 at 16-21), the Note is not a negotiable instrument for three independent reasons: (1) the Note is not payable to bearer or to order; (2) the Note does not create an unconditional promise or order to pay a fixed amount of money and is subject to the Letter Agreement; and (3) the Note is subject to all defenses of the Atigeo Parties, including repudiation. To the extent WCP challenges whether the Promissory Note is a Negotiable Instrument, Sandoval incorporates pages 16 through 21 of his motion for summary judgment, stating the legal arguments why the Note is not a negotiable instrument.

**H.    The Debtor's Estate's Failure to Assume the Letter Agreement was a Repudiation before WCP Purchased the Claims against Sandoval.**

In addition to the repudiation discussed above, the Letter Agreement was breached prior to WCP purchasing claims against Sandoval. In a Chapter 7 case, all executory contracts and unexpired leases are deemed rejected if they are not assumed within 60 days after the entry of the order for relief, subject to the Court's power to extend that time period. 11 U.S.C. § 365(d)(1). Any motion for an order extending the 60-day period must be made within that period. *Carrico v. Tompkins (In re Tompkins)*, 95 B.R. 722, 724 (Bankr. 9th Cir. 1989). Because the Letter Agreement was an executory contract, the Trustee's failure to assume it within 60 days of the Conversion Date was a breach of the Letter Agreement.

      i.      *The Letter Agreement was an Executory Contract.*

The Bankruptcy Code does not define "executory contract," but most courts have adopted the so-called "Countryman definition" of an executory contract, *i.e.*, "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy (Part I)*, 57 Minn. L. Rev. 439, 460 (1973); *accord* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection*,' 59 U. Colo. L. Rev. 845, 893 (1988) (stating executory contract means "simply . . . a contract under which (a) debtor and non-debtor each have unperformed obligations, and (b) the debtor, if it ceased further performance, would have no right to the other party's continued performance"); H.R. Rep. No. 95-595, at 347 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6303 ("Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides."). Whether a contract is "executory" within the meaning of the Bankruptcy Code is a question of federal law. *Benevides v. Alexander (In re Alexander)*, 670 F.2d 885, 888 (9th Cir. 1982).

The Letter Agreement was an executory contract at all times relevant to Blixseth's bankruptcy case. Generally speaking, the Letter Agreement was a settlement agreement, the purpose of which was to "provide for a reasonable separation of Opspring, xPatterns and AziMyth [Atigeo] among the parties in a manner that allows for their continuation and resolve[] the issues" between the Blixseth Family and the Atigeo Parties. Letter Agreement at 1. While deemed a settlement agreement, it is well established that settlement agreements can be executory contracts. *E.g., Jensen v. Cont'l Fin. Corp.*, 591 F.2d 477, 481 (8th Cir. 1979); *Enter. Energy Corp. v. United States (In re Columbia Gas Sys. Inc.),* 50 F.3d 233 (3d Cir. 1995). Under the Countryman test, the key issue is whether "performance remain[ed] due to some extent on both sides" of the Letter Agreement. H.R. Rep. No. 95-595, at 347. The record described above conclusively establishes that numerous obligations remain unperformed.

ii.    The Estate's Failure to Assume the Letter Agreement is a Further Breach and Rejection of that Contract.

Neither Blixseth nor the Trustee took any action to assume, reject, or extend the time to assume or reject the Letter Agreement prior to the Deemed Rejection Date (or thereafter). Accordingly, the Estate rejected the Letter Agreement as a matter of law by operation of Section 365(d)(1). *See In re Robert L. Helms Constr. & Dev. Co.*, 139 F.3d 702, 706 n.10 (9th Cir. 1998) ("If the trustee under chapter 7 does not assume or reject an executory contract within 60 days after the order for relief, the contract is deemed rejected."); *Fursman v. Ulrich (In re First Prot., Inc.)*, 440 B.R. 821, 831 (BAP 9th Cir. 2010) ("Section 365(d)(1) plainly states that if the chapter 7 trustee does not assume or reject an executory contract within 60-days, 'then such contract . . . is deemed rejected.'"); *Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 423 (BAP 9th Cir. 2007) ("The flexibility preserved for chapters 9, 11, 12 and 13 with respect to executory contracts emerges in even greater relief when contrasted with the more rigid regime imposed on chapter 7 cases by § 365(d)(1): 'if the trustee does not assume or reject an executory contract . . ., then such contract . . . is deemed rejected.'"); *Top Rank, Inc. v. Ortiz (In re Ortiz)*, 400 B.R. 755, 759-60 (C.D. Cal. 2009). Indeed, the operation of Section 365(d)(1) in Chapter 7 cases is so strict and automatic that the Ninth Circuit has referred to it as a "trap." *See In re Robert L. Helms Constr. & Dev. Co.*, 139 F.3d at 706.

Under the Bankruptcy Code, the postpetition rejection of an executory contract constitutes a prepetition breach of the contract. 11 U.S.C. § 365(g); *Sulmeyer v. Sycamore Inv. Co. (In re Aslan)*, 909 F.2d 367, 369-72 (9th Cir. 1990); *In re Yellowstone Mountain Club, LLC*, No. 08-61570-11 et al., 2011 WL 4837514, at *6 (Bankr. D. Mont. Oct. 12, 2011). Following rejection, the parties to a contract must resort to state law to determine their rights as a result of the breach, to the extent state law does not contravene the Bankruptcy Code. *In re WorldCom, Inc.*, 361 B.R. 675, 684 (Bankr. S.D.N.Y. 2007); *In re Yasin*, 179 B.R. 43, 49-50 (Bankr. S.D.N.Y. 1995); *In re Indep. Am. Real Estate, Inc.*, 146 B.R. 546, 553 (Bankr. N.D. Tex. 1992); *In re Audra-John Corp.*,

140 B.R. 752, 757 (Bankr. D. Minn. 1992); *In re Dry Creek Farms, LLC*, No. 09-43118-pwb, 2011 WL 9210473, at *1 (Bankr. N.D. Ga. Aug. 30, 2011).

Pursuant to 11 U.S.C. § 365(d)(1), the Estate rejected the Letter Agreement as a matter of law by operation when neither Blixseth nor the Trustee took any action to assume, reject, or extend the time to assume or reject the Letter Agreement prior to the Deemed Rejection Date. Accordingly, this constitutes a prepetition breach of the contract and a further repudiation of that contract.[6]

## I.  Even if Sandoval is liable for the Guaranty, he should not be liable for any Interest under the Guaranty.

At the least, Sandoval should not be liable for the eight percent interest WCP claims it is owed. Although generally a guarantor is liable for interest running from the date the principal defaults, Sandoval's liability is expressly capped at $5 million with no requirement that he pay interest on that $5 million. Letter Agreement §2; *see, e.g.*, *Seattle First Nat. Bank v. W. Coast Rubber Inc.,* 41 Wash. App. 604, 608, 705 P.2d 800, 803 (1985) (holding guarantor only liable for statutory interest where a limited guaranty did not specify a rate of interest, either directly or by reference). A guaranty is subject to the usual rules of contract interpretation and must be interpreted to give effect to the mutual intention of the parties at the time the contract was made. *See Principal*

---

[6] WCP has suggested that if it loses at trial here and the Letter Agreement is rescinded, WCP could later file an action against Sandoval for Blixseth's commercial tort claims, which were released as part of the 2007 Letter Agreement. WCP cannot bring these more than 11 year old claims because (1) the statute of limitations has long since run on those claims, whether the claims are based in Washington law where Sandoval resided or California law where Blixseth resided (*see* RCW 4.16.080 (tort actions three year statute of limitation); Cal. Civ. Proc. §§ 335.1, 338(d) (tort actions no more than three year statute of limitations); (2) such claims would be *res judicata* because WCP should have brought them as alternative claims in its third party complaint here, which makes no mention of commercial tort claims (*see* Dkt. No. 193-1); and (3) WCP did not identify such claims with particularity in its security agreement as required by Colorado law, which governs the WCP-Blixseth security agreement. *See* Col. Rev. Stat. § 4-9-108(e)(1); *see also In re Zych*, 379 B.R. 857, 860–61 (Bankr. D. Minn. 2007). Once this trial is over, WCP's claims against Sandoval are concluded.

*Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman*, 65 Cal. App. 4th 1469 (1998). Here, the obvious intent was Sandoval's guaranty was no more than $5 million.

## VII. CONCLUSION

For the reasons set forth above, the Court should rule in Sandoval's favor and dismiss all claims against him.

DATED this 23rd day of July, 2018.

Respectfully submitted by:

**BAKER & HOSTETLER LLP**

*s/ Curt Roy Hineline*
Curt Roy Hineline *(pro hac vice)*
James R. Morrison *(pro hac vice)*
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Tel: (206) 332-1380
Fax: (206) 624-7317
Email: chineline@bakerlaw.com

John Grant
Jackson, Murdo & Grant, P.C.
203 North Ewing
Helena, MT 59601-4240
Tel: (406) 442-1300
Email: jgrant@jmgm.com

*Attorneys for Michael Sandoval*

## **CERTIFICATE OF SERVICE**

I, the undersigned, John Grant, hereby certify under penalty of perjury that a copy of the within and foregoing Michael Sandoval's Trial Brief was served via the Court's ECF system and that in addition, service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users: None.

Dated this 23rd day of July, 2018.

*s/ John Grant*

John Grant