# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN RE ) | |
| ) | Case No.  09-60452 |
| **EDRA D. BLIXSETH,** ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| **ATIGEO LLC and** ) | |
| **XPATTERNS LLC,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adv. No. 09-00105 |
| ) | |
| **RICHARD J. SAMSON, et al.,** ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| **WESTERN CAPITAL** ) | |
| **PARTNERS LLC,** ) | |
| ) | |
| Third-party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **MICHAEL SANDOVAL,** ) | |
| **XPATTERNS LLC, and** ) | |
| **ATIGEO LLC,** ) | |
| ) | |
| ) | |
| Third-party Defendants. ) | |
| _____ ) | |

MEMORANDUM OF DECISION - 1

## MEMORANDUM OF DECISION

### INTRODUCTION

In this adversary proceeding, Western Capital Partners LLC ("WCP") as third-party plaintiff filed suit against third-party defendants Michael Sandoval ("Sandoval"); xPatterns, LLC, a Washington limited liability company ("xPatterns"); and Opspring LLC ("Opspring"), a Washington limited liability company. The basis of WCP's third-party cause of action is breach of contract and a claim for damages.

The matter was tried before the Court on August 6 and 7, 2018, and taken under advisement following oral closing argument. Adv. Doc. No. 466.[1] This Decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

### PROCEDURAL BACKGROUND

This adversary proceeding arises from a chapter 11 bankruptcy case filed by Edra Blixseth ("Blixseth") on March 26, 2009, in the Bankruptcy Court for the District of Montana. Case No. 09-60452.[2] The case was converted to a chapter 7 liquidation on May 29, 2009. Doc. Nos. 178, 179. Richard Samson ("Samson")

---

[1] Filings in this adversary proceeding will be identified by "Adv. Doc. No." and those in the underlying bankruptcy case by "Doc. No."

[2] The Court takes judicial notice of its files and records. Fed. R. Evid. 201.

MEMORANDUM OF DECISION - 2

was appointed as chapter 7 trustee.

The instant action is one of a host of adversary proceedings filed in connection with Blixseth's bankruptcy.  On December 7, 2009, Atigeo LLC ("Atigeo"[3]) and xPatterns filed a complaint against Samson, Blixseth, Opspring, and others, raising numerous claims.[4]  On March 30, 2010, the Court granted WCP leave to intervene as a third-party in this adversary action.  Adv. Doc. Nos. 64, 67, 68.  On November 3, 2010, WCP filed an answer to the adversary complaint, and asserted a third-party complaint against Sandoval, xPatterns, and Atigeo ("Third-party Defendants").  Adv. Doc. Nos. 154.  This third-party complaint alleged that WCP had foreclosed on certain contract and account receivable rights owned by Blixseth, and thus succeeded to her interests in the same, including Blixseth's rights or claims against xPatterns, Atigeo and Sandoval.

WCP amended its complaint on May 23, 2011, to add claims against Atigeo.  Adv. Doc. Nos. 193, 213 (the complaint as amended is referred to as the "Third-party Complaint").  In the Third-party Complaint, WCP asserted a number

---

[3]  Atigeo is the successor to AziMyth LLC ("AziMyth").  AziMyth was the party that entered into a settlement agreement, which will be discussed further below.  Throughout the litigation the parties generally referred to this business entity as Atigeo, and the Court will likewise do so in this Decision.

[4]  The other defendants were three individuals and an entity, Blxware LLC, a Delaware limited liability company ("Blxware").  Blxware is a successor in interest to Opspring.  However, the parties often referred to Opspring and Blxware interchangeably.  For ease and clarity, the Court will generally refer to "Opspring."  The distinction between Opspring and Blxware is not important to this Decision.

MEMORANDUM OF DECISION - 3

of claims against the Third-party Defendants, including several claims that xPatterns breached its obligations under a settlement agreement and a claim that Sandoval breached his guarantee of such.  Adv. Doc. Nos. 193-1 at 9–10; 213. Sandoval answered the Third-party Complaint, asserting affirmative defenses. Adv. Doc. No. 229 at 9.  This is the matter that was tried in 2018 and is addressed in this Decision.

**JURISDICTION**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  While the matter is a non-core, "related to" proceeding, the parties have expressly consented to entry of a final judgment by this Court.[5]  *See* 28 U.S.C. § 157(c)(2).

**FACTS**[6]

At all relevant times, xPatterns was managed by Sandoval as its CEO, and it was owned by Sandoval and others as its members.  Opspring was a company formed by Sandoval and, prior to March 31, 2007, it was managed by Sandoval and owned by him and other members.  Both xPatterns and Opspring were

---

[5]  *See* Adv. Doc. No. 464 at 2.

[6]  Certain "agreed facts" were established by a Final Pretrial Order executed by counsel for WCP and Sandoval and entered by the Court on August 7, 2018.  Adv. Doc. No. 464.  Other facts as set out in this Decision have been determined by the Court from the entirety of the testimony at trial and from exhibits duly admitted into evidence.  The Court has weighed the witnesses' credibility as well as the weight to be given their testimony, even where such matters are not explicitly addressed in this Decision.

MEMORANDUM OF DECISION - 4

subsidiaries of Atigeo, their parent company.

In 2006, Blixseth invested $8 million in Opspring and $10 million in xPatterns. In June 2006, xPatterns made a $5 million loan to Sandoval with which he purchased real property in Kirkland, Washington, used by him and his family as a personal residence.

In 2007, disagreements between Sandoval and Blixseth arose. To resolve their disputes, Sandoval and Blixseth agreed to end their business relationship and, on March 31, 2007, executed an agreement to that effect. Ex. 13 (the "Letter Agreement").[7] The terms of the Letter Agreement include the following:

- Blixseth's $10 million investment in xPatterns was to be "redeemed" by a $2 million payment within 120 days, and the issuance of an $8 million unsecured note payable $1 million at the end of the second year, $2 million at the end of the third year, and the balance at the end of the fourth year. *Id.* at ¶ 1. The equity interests of Blixseth would correspondingly be cancelled. *Id.* at ¶ 3.

- Sandoval granted xPatterns a security interest in the Kirkland, Washington property, whether owned by Sandoval and his wife or by any "affiliate" entity they owned or controlled. Such security interest would be released by xPatterns only in connection with a sale of the property and Sandoval's payment of his obligation to xPatterns and by xPatterns' satisfaction of the first $2 million owed Blixseth. *Id.* at ¶ 2.

- Sandoval relinquished all interests in, control of, or relationship with Opspring. *Id.* at ¶ 6, 8. This would leave Blixseth as the sole owner of Opspring. *Id.* at ¶ 7.

---

[7] Many clauses in the Letter Agreement refer to the interests of Blixseth and several other individuals who are, collectively with Blixseth, called the "Blixseth Family." For purposes of this decision and for ease of exposition, and unless it is a direct quote, the Court will simply refer to "Blixseth" as encompassing the family members as well.

MEMORANDUM OF DECISION - 5

- Blixseth agreed that she would cause Opspring to pay Atigeo a quarterly performance fee of 5% of Opspring revenue up to a maximum of $15 million.  The first $5 million thereof was to be paid to Blixseth and used to reduce xPatterns' note to Blixseth.  *Id.* at ¶ 4.  Other than this performance fee to Atigeo, Atigeo would have no further interest, equity or otherwise, in Opspring.  *Id.* at ¶ 5.

- Atigeo agreed to defend and indemnify Opspring from certain claims and causes of actions, but not others.  *Id.* at ¶ 10.  Opspring agreed to defend and indemnify Atigeo, xPatterns, and Sandoval in connection with certain identified litigation.  *Id.* at ¶ 11.

- By reason of the execution of the Letter Agreement and $500,000 previously advanced by Blixseth to Atigeo, obligations due and owing from Yellowstone Club to Atigeo were reduced to $1 million and Blixseth would cause Yellowstone Club to pay the same to Atigeo within 30 days of the Letter Agreement.  *Id.* at ¶ 9.

- The parties agreed not to disclose the Letter Agreement's terms, to keep confidential the other parties' trade secrets and confidential information, and not to disparage one another.  *Id.* at ¶ 23.

- The parties released all claims and causes against one another, except the obligations arising under the Letter Agreement.  *Id.* at ¶ 14.

- The parties agreed that "This Letter Agreement shall be governed by the laws of the State of California applicable to agreements made, and to be performed, therein and without resort to California conflict of law provisions or rules."  *Id.* at ¶ 29.

Additionally, paragraph 2 mentioned above also provided, in part:

> By signing this Letter Agreement, Michael Sandoval ("Sandoval") guarantees to the Blixseth family that the first $5 million portion of the xPatterns obligations will be paid when due, no matter what may happen.  This is a continuing guaranty until the final payment in full of all of the first $5 million portion of the xPatterns Obligations.  Sandoval irrevocably waives any rights he may have against xPatterns by reason of subrogation, setoff, or otherwise.

MEMORANDUM OF DECISION - 6

*Id.* at ¶ 2 (the "Guarantee").

On April 1, 2007, Sandoval, on behalf of xPatterns, executed the required $8 million promissory note. Ex. 14 ("Note"). While the first $2 million payment required under paragraph 1 of the Letter Agreement was satisfied through agreed upon set-offs and a payment of $382,568 on March 10, 2008, the remaining $8 million owed under the Note was never paid.

Subsequent to execution of the Letter Agreement, Blixseth guaranteed a $13,650,000 loan made by WCP and, as collateral, pledged certain personal property, which included her contractual rights in the Letter Agreement and the related Note. WCP eventually foreclosed its lien and became the owner of Blixseth's interests and rights arising from the Letter Agreement, including Sandoval's Guarantee. Ex. 25.

The litigation before the Court focuses on WCP's claims against Sandoval under the Guarantee, and Sandoval's defenses.

**DISCUSSION AND DISPOSITION**

    **A.    Disputes over the Letter Agreement**

As noted, the parties expressly agreed California law would apply to any issues or disputes regarding the Letter Agreement. Under California law, a cause of action for breach of contract is comprised of the following elements: (1) the contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the

MEMORANDUM OF DECISION - 7

defendant's breach, and (4) the resulting damages to the plaintiff.  *Prof'l Collection Consultants v. Lauron*, 8 Cal. App. 5th 958, 968 (2017); *Reichert v. Gen. Ins. Co. of Am.*, 442 P.2d 377, 381 (Cal. 1968).

Under the Letter Agreement, Sandoval guaranteed to Blixseth that the first $5 million of xPatterns obligation would be paid when due, "no matter what may happen."  This was a "continuing guarantee" until the $5 million was paid in full.  However, Blixseth no longer has any rights under the Letter Agreement since it (along with other collateral) was foreclosed upon by WCP.

### 1.     Whether WCP may enforce the Letter Agreement

Generally speaking, under California law only a party to the contract may sue for its breach.  That rule, however, has exceptions.  One exception is that an assignee may sue for breach of contract.  *Applera Corp. v. MP Biomedicals, LLC* 173 Cal. App. 4th 769, 786 (2009) (assignee had standing to sue for breach of contract providing for royalty payments).[8]

Blixseth pledged her rights under the Letter Agreement as collateral on a loan to WCP.  The parties agree that, on March 22, 2010, WCP foreclosed its lien against that collateral and became the holder, and effectively the assignee, of the

---

[8]  *Applera* dealt with the issue of whether the federal courts had original jurisdiction over Plaintiff's claims.  The court determined the claim was neither created by federal patent law, nor was patent law a necessary element of the claim.  *See Christianson v. Colt Indus. Operating Corp*, 486 U.S. 800, 808–09 (1988).  Rather, the plaintiff's claim was for breach of contract under state law.  Thus, the California state court had jurisdiction over the claim and California contract law was applied.

MEMORANDUM OF DECISION - 8

claims arising under the Letter Agreement. *See* Adv. Doc. No. 464 at 1. As the assignee of Blixseth's rights under the Letter Agreement, WCP has standing pursuant to California law to sue on the alleged breach of the Letter Agreement's terms.

In such a case, in order to meet its burden on the claim for breach of the agreement, the assignee must prove its predecessor's performance or excuse for nonperformance. *See Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178–80 (2008) (requiring assignee to provide evidence of its predecessor's performance under a contract in order to survive a motion for summary judgment). Thus, in order to prevail on a breach of contract claim, WCP bears the burden of establishing Blixseth performed her obligations under the Letter Agreement.

### 2.      The claim on the Guarantee

#### a.      Arguments of the parties

Sandoval asserts that the Letter Agreement was intended to be a fully-integrated agreement to settle all claims among the parties, and Blixseth failed to perform her obligations, thus relieving Sandoval of his liability under the Letter Agreement.

WCP, on the other hand, argues Sandaval's Guarantee is facially unconditional. It contends that Sandoval's agreement to pay "no matter what may

MEMORANDUM OF DECISION - 9

happen" obligates him to fulfill the promises in the Guarantee regardless of whether the other parties to the Letter Agreement fulfilled their obligations. Accordingly, WCP argues Sandoval necessarily waived all defenses to the payment of the first $5 million owed by xPatterns to Blixseth.

Additionally, WCP argues that xPatterns' obligation to pay $10 million to Blixseth, and Sandoval's partial guarantee of such, is severable from the other terms of the Letter Agreement, and it is therefore not a fully integrated agreement as Sandoval contends. According to WCP, Sandoval is not excused from fulfilling the requirements of the Guarantee as a result of the failures of Blixseth and Opspring to fulfill their obligations under allegedly separate and distinguishable provisions in the Letter Agreement.

### b. Unconditional nature of the Guarantee

Whether the phrase "no matter what may happen" creates an unconditional guarantee of the xPatterns obligation by Sandoval, is a matter of contract interpretation. The California Court of Appeals has explained:

> The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.

*Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1356 (2004) (citations and quotations

MEMORANDUM OF DECISION - 10

omitted).

> The interpretation of a contract involves a two-step process: First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," *i.e.*, whether the language is "reasonably susceptible" to the interpretation urged by a party.  If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract . . . .  Furthermore, when two equally plausible interpretations of the language of a contract may be made[,] parol evidence is admissible to aid in interpreting the agreement[.]

*Id*. at 1351.

There are two arguable interpretations of the parties' intentions with regard to the "no matter what may happen" language.  The first, asserted by WCP, is that the parties intended that Sandoval would be absolutely obligated to pay to Blixseth any portion of the initial $5 million that xPatterns might fail to pay, regardless of any breaches by any of the other parties to the Letter Agreement.  The second, asserted by Sandoval, is that the Letter Agreement was designed to provide a source of funds that xPatterns could use to pay its obligation to Blixseth and, should the funds generated be insufficient for xPatterns to meet its obligation, he guaranteed the first $5 million would be paid.  In other words, Sandoval asserts "no matter what may happen" refers to the potential that the designed function and interrelated provisions of the Letter Agreement might not be realized, but that it did not mean that he would have to pay $5 million to Blixseth regardless of her

MEMORANDUM OF DECISION - 11

breaches.

The context of the "no matter what may happen" language within the Letter Agreement provides some evidence of the parties' intent. The first clause of the Letter Agreement provides for $10 million to be paid by xPatterns to Blixseth in order to redeem Blixseth's interest in xPatterns. The second clause provides Sandoval's Guarantee of "the first $5 million portion of the xPatterns Obligation . . . when due, no matter what may happen." Sandoval guaranteed xPatterns' debt; he did not make an absolute, direct payment obligation to Blixseth. Inherent in the use of a guarantee is the understanding that the underlying obligation is legally enforceable.

Sandoval's testimony provides additional evidence of the parties' intent. Sandoval testified, in line with his argument, that the parties intended the "no matter what may happen" language to represent a commitment by Sandoval to ensure the first $5 million was paid to Blixseth *in the event that the various other clauses in the Letter Agreement did not generate sufficient funds to make the payments, as they were designed*. This plausible explanation, coupled with the context of the structured payments and mutual obligations of all parties, leads the Court to conclude the parties to the Letter Agreement did not intend the Guarantee to be an absolute, independent commitment to pay $5 million to Blixseth despite any breaches on her part.

MEMORANDUM OF DECISION - 12

### c.      Divisibility of the Letter Agreement provisions

WCP argues, in essence, that the Letter Agreement is a single document containing two separate and divisible agreements.  One agreement is that Blixseth would relinquish her interest in xPatterns in exchange for a $10 million debt obligation from xPatterns, $5 million of which Sandoval guaranteed.  Regarding this first agreement, WCP asserts that Blixseth completed her end of that deal by relinquishing ownership and that xPatterns and Sandoval breached their corollary obligation to pay Blixseth on the debt obligation.  As further argued by WCP, all of the other obligations of Sandoval, xPatterns, Blixseth, and Opspring would constitute a second, separate agreement under which Sandoval and Blixseth both have substantial unperformed or underperformed obligations.

Whether multiple obligations in an agreement are divisible or severable—cases on the issue tend to use those terms interchangeably—is a question of state law.  *Moore v. Pollock (In re Pollock)*, 139 B.R. 938, 940 (9th Cir. BAP 1992).  In this case, under California law, the intentions of the parties control whether parts of a contract or lease, or part performance thereunder, can be separated and treated as independent legal obligations.  *In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 845 (Bankr. C.D. Cal. 1999); *Hudson v. Wylie*, 242 F.2d 435, 447 (9th Cir. 1957); *Lewis v. Shell Oil* Co., 29 P.2d 413, 415 (Cal. 1934).  If the contracting parties intend an entire contract, not a severable one, the

MEMORANDUM OF DECISION - 13

courts will not find it divisible.  *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1389 (2004) (citations omitted).  The parties' intent may be revealed by "the nature and character of the agreement."  *Id*. (quoting *Jozovich v. Cent. Cal. Berry Growers Ass'n*. 183 Cal. App. 2d 216, 222–24 (2004).  Intent can further be shown by the parties' acts and conduct.  *Id*.

WCP argues the inclusion of a severability clause evidences the parties' intent for the Letter Agreement to be divisible.  Paragraph 28 of the Letter Agreement provides:

> This Letter Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Letter Agreement, or the application thereof to any person of circumstances, shall for any reason and to any extent be invalid and unenforceable, the remainder of this Letter Agreement, or the application of such provision to the unaffected persons or circumstances, shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

Ex. 13 at ¶ 28.  Even when a contract includes a severability clause, the "contract is not divisible where there is a showing that it was the intention of the parties to treat [their] agreement as an entire contract, and where it appears that their engagements would not have been entered into except upon the clear understanding that the full object of the contract should be performed."  *Securitas Sec. Servs. USA, Inc. v. Superior Court*, 234 Cal. App. 4th 1109, 1126 (2015) (internal quotation omitted) (holding that, despite inclusion of a severability clause, a contract was not divisible because other evidence showed the parties did

MEMORANDUM OF DECISION - 14

not intend the agreement to be divisible).  Under California law, the inclusion of a

severability clause is but one factor to be considered in ascertaining whether the

parties intended the agreement to be divisible.[9]

The Letter Agreement's introductory paragraph provides some evidence of

the parties' intent, expressing:

> We[10] have philosophical differences about the operations of the
> businesses.  The purpose of this [Letter Agreement] is to provide for a
> reasonable separation of Opspring, xPatterns and [Atigeo] among the
> parties in a manner that allows for their continuation and resolves the
> issues between us.  We therefore agree as follows:

Ex. 13 at 1.  To that end, the Letter Agreement outlines the parties' agreement in

twenty-nine numbered paragraphs.  The introductory language of the Letter

Agreement shows the parties intended the Letter Agreement to be an entire

encompassing and inclusive contract, creating a global settlement of all issues.

Construing the Letter Agreement as divisible, as urged by WCP, would

render several provisions nonsensical.  For example, paragraphs 5, 6, 7, and 8

provide that Atigeo and Sandoval would relinquish all interests in Opspring,

Sandoval would resign as an employee of Opspring, and Blixseth would own all

the issued and outstanding equity interests of Opspring.  Absent the context

---

[9]  Additionally, ¶ 28 addresses a situation where a particular provision of the Letter
Agreement is found to be "unenforceable," thus preserving the balance of the agreement.  That is
not the situation here, nor does it *ipso facto* suggest a divisible contract.

[10]  The Letter Agreement refers to numerous parties, including the Blixseth Family,
Opspring, xPatterns, and Atigeo.

MEMORANDUM OF DECISION - 15

supplied by paragraphs 1, 2, and 3, which provides Blixseth's corollary agreement to relinquish all rights and involvement in xPatterns, the relinquishment of rights in Opspring by Atigeo and Sandoval does not appear to have any rational basis. Rather, the Letter Agreement is a global settlement of the parties' claims in which Blixseth agreed to relinquish all rights in xPatterns and, Sandoval and Atigeo agreed to relinquish their rights in Opspring.

Additionally, paragraph 14 of the Letter Agreement provides a series of releases by the parties. Blixseth released all claims against Atigeo, xPatterns, and Sandoval; Opspring released its claims against Atigeo, xPatterns, and Sandoval; and Atigeo, xPatterns, and Sandoval released all claims against Blixseth. *Id*. at 4–5. These releases applied "to all claims, whether known, unknown or unanticipated." *Id*. at 5. These mutual releases also make little sense without the context provided by paragraphs 1 and 2.

Sandoval's uncontroverted trial testimony provides further evidence of the parties' intent. Sandoval credibly explained that the various enumerated clauses in the Letter Agreement were actively negotiated and, at least from his perspective, were intended to ensure that xPatterns and Atigeo could fulfill their financial obligations to employees, creditors, and Blixseth.

For example, in paragraph 9 of the Letter Agreement, Blixseth agreed to cause the Yellowstone Club to pay its $1 million obligation to Atigeo within 30 days of the Letter Agreement date. Ex. 13 at 3. Sandoval explained the timing of

MEMORANDUM OF DECISION - 16

this payment was deliberately negotiated in order to allow xPatterns to pay its employees' wages during the transition and to partially fund the $2 million payment due to Blixseth 120 days after the date of the Letter Agreement.

Additionally, Sandoval testified that at the time the Letter Agreement was entered, Opspring had a $100 million "letter of commitment" to provide services to the U.S. Government.  In order to satisfy a significant portion of the obligation to Blixseth, paragraph 4 provided that Blixseth would cause Opspring to pay to Atigeo a performance fee equal to 5% of revenue earned by Opspring, up to a maximum performance fee of $15 million.  Given that letter of commitment from the government, Sandoval was highly confident Opspring would generate $100 million in revenue and the $5 million "performance fee" would be paid.

According to Sandoval, it was only due to the inclusion of the various provisions designed to ensure funds were available to pay Blixseth that he agreed to guarantee the obligation.  His understanding and belief at the time of entering into the Letter Agreement was that, should all parties to the Letter Agreement fulfill their obligations, the entire $5 million he guaranteed to Blixseth would be satisfied and, therefore, the likelihood of him being personally required to pay Blixseth was minimal.

Having considered all the trial evidence, especially the plain language of the

MEMORANDUM OF DECISION - 17

Letter Agreement and the uncontroverted testimony of Sandoval,[11] the Court concludes the Letter Agreement must be construed as an entire contract, rather than a divisible one. While any one of the Letter Agreement's paragraphs might be cherry-picked and construed as an independent stand-alone commitment by one party, the evidence as a whole established that Sandoval, and the other parties to the Letter Agreement, intended the Letter Agreement to be a global resolution of all issues, rather than a series of independent agreements.

### 3.    Breach of contract

The next issue is whether WCP has met its burden of proving its claim for breach of contract. It is uncontested that the Letter Agreement constitutes a contract under which xPatterns agreed to pay Blixseth $10 million and that Sandoval personally guaranteed payment of the first $5 million of such obligation. While the evidence at trial showed the first $2 million of xPatterns' obligation was satisfied through agreed-upon offsets, it is uncontested that xPatterns failed to pay any part of the remaining $8 million. It is further uncontested that WCP, as the successor in interest to Blixseth's interests under the Letter Agreement, suffered damage as a result of the breaches—being deprived of millions of dollars in payments from xPatterns and/or Sandoval. The question, under California law, is whether WCP has met its burden of proving the "plaintiff's performance [of the

---

[11]   Blixseth was not available to testify at trial. And, by reason of the Court's contemporaneously issued Decision, the use of Blixseth's prior trial testimony was denied.

contract] or excuse for nonperformance." *Prof'l Collection Consultants*, 8 Cal. App. 5th at 968. Here, as successor to the rights of Blixseth under the Letter Agreement by reason of its foreclosure of Blixseth's pledged collateral, WCP must establish Blixseth performed, or had a justifiable excuse for nonperformance.[12]

Sandoval alleges Blixseth failed to perform under the Letter Agreement in several respects. First, Sandoval alleges Opspring earned at least $2 million in revenue and Blixseth failed to fulfill her obligation to cause Opspring to pay the 5% performance fee required on such revenue. Adv. Doc. No. 448 at 6.

Nicholas Rhodes, Opspring's managing director, testified during his deposition that Opspring generated revenue from a governmental contract. Adv. Doc. No. 454-2 at internal page 92.[13] However, rather than the $100 million in revenue anticipated by Sandoval, only $2 million was generated.[14] *Id*. Under the Letter Agreement, Blixseth was obligated to cause Opspring to pay a 5%

---

[12]  Sandoval alleged throughout this proceeding that the "Blixseth Parties," (referring collectively to Edra Blixseth and her family members who were parties to the Letter Agreement) and Opspring failed to fulfill their obligation under the Letter Agreement in several respects. *See, e.g.*, Adv. Doc. No. 400 (Sandoval's prior Motion for Summary Judgment). However, only Blixseth's individual conduct is relevant to this question because WCP is the successor of *her* contractual rights in the Letter Agreement, not the contractual rights of all "Blixseth Parties" and/or Opspring. For this reason, the Court will limit its consideration to WCP's proof of Blixseth's performance or excuse for nonperformance of *her* obligations.

[13]  Rulings on the admissibility of the deposition transcripts of Nicholas Rhodes and Alan Annex, along with the transcript of Blixseth's prior trial testimony, are addressed in a companion decision. Other than this statement by Rhodes regarding $2 million in revenue being generated by Opspring, the Court determined little in the admitted depositions of Rhodes and Annex is relevant to the issue at hand.

[14]  The exact timing of this revenue is not clear. However, Rhodes testified it was generated "just before" Blixseth filed her bankruptcy petition on March 26, 2009. *Id*. at 93.

MEMORANDUM OF DECISION - 19

performance fee (*i.e.*, $100,000). That performance fee was to be made "promptly at the end of [the] calendar quarter." Ex. 13 at 2, paragraph 4. WCP has provided no evidence that Blixseth fulfilled that obligation. To the contrary, WCP appears to acknowledge no performance fee was ever paid. Instead, WCP proposes to provide a "credit" for such unpaid fee in its calculation of the amounts owed by Sandoval and xPatterns. *See* Ex. 171. This credit, nearly 10 years late, is insufficient to cure the breach. Thus, on the evidence, the Court concludes WCP has not proven Blixseth performed her obligations under the Letter Agreement to cause payment of the $100,000 performance fee.

Sandoval also alleges Blixseth failed to perform under the Letter Agreement by disclosing the Letter Agreement's terms and by disparaging Sandoval in prior litigation. The Letter Agreement provides that Blixseth would not "disclose (or cause or allow to be disclosed) any terms of th[e] Letter Agreement to any third party or entity without the prior written consent" of Atigeo. Ex. 13 at 6. It further provides that Blixseth agreed "to not, directly or indirectly . . . disparage [Atigeo], xPatterns, Sandoval," or other listed parties. *Id*. at 7.

On May 28, 2008, ten months before her bankruptcy filing, Blixseth filed a lawsuit against xPatterns, Atigeo, and Sandoval, among others. Ex. 19. In her complaint, Blixseth disclosed the following about the Letter Agreement:

- "The Agreement requires xPatterns to return Blixseth's $10 million investment, by paying $2 million within 120 days of the Agreement and by paying the $8 million balance by installments: $1 million on

or about March 31, 2009, $2 million on or about March 31, 2010, and $5 million on or about March 31, 2011."

- "The Agreement also requires Sandoval to personally guarantee payment of the first $5 million that xPatterns owes to Blixseth, and to give xPatterns a security interest in the Kirkland Real Property owned by Sandoval through his family trust[.]"

Ex. 19. at 4.  Additionally, Blixseth made the following statements about

Sandoval, xPatterns, and Atigeo in that same complaint:

- Sandoval made "significant misrepresentations" with respect to a loan he received from xPatterns.

- "After entering into the Agreement, Defendants engaged in a course of action to eliminate xPatterns' ability to repay Blixseth's debt and insulate Sandoval from personal liability for repayment on the debt by: . . . fraudulently transferring assets from xPatterns to Atigeo and liabilities from Atigeo to xPatterns[.]"

- "Defendants caused xPatterns to cancel Sandoval's $5.75 million debt to the company in exchange for capital stock he owned in Atigeo.  The Atigeo capital stock used in this transaction was valued at an inflated valuation price and was of little or no value[.]"

- "Defendants knowingly caused false financial information to be disseminated to investors, in order to solicit and acquire additional capital investment in Atigeo."

- "New money invested in Atigeo has been used to pay exorbitant compensation and benefits to Sandoval and [his wife], rather than advance the business of Atigeo and xPatterns."

- Defendants "knowingly made numerous . . . false statements and omissions to investors[.]"

- A former employee "complained of repeatedly dishonest business dealings and representations on behalf of xPatterns and Atigeo by Sandoval."

MEMORANDUM OF DECISION - 21

- • "xPatterns' cash and other assets have been depleted, in part by the unjustifiably high compensation xPatterns paid to Sandoval, which was in addition to the compensation that Sandoval and his wife were simultaneously receiving from Atigeo."

- • "Sandoval has obtained company reimbursement for purely personal expenses, further depleting the company's resources."

*Id*. at 4–9.

The question is whether WCP has shown Blixseth honored her obligations of non-disclosure and non-disparagement.  As to nondisclosure, Blixseth did disclose a portion of the terms of the Letter Agreement.  In order to properly do so, she was required to obtain Atigeo's written consent.  WCP has provided no evidence that Blixseth obtained Atigeo's required consent.

"Disparagement" has been defined as a "false and injurious statement that discredits or detracts from the reputation of another's character, property, product, or business."  Black's Law Dictionary 538 (9th ed. 2009).  The statements made by Blixseth accused Sandoval, xPatterns, and Atigeo of, among other things, dishonesty, misrepresentation, fraudulent transfer, defrauding investors, and misappropriating funds.  These are serious accusations that discredit or detract from the reputation of Sandoval, xPatterns, and Atigeo.

And, while truth is a long-standing defense under California law to claims related to the dissemination of false, injurious statements, *see Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1180 (2000) (providing that "the truth of the offensive statements or communications is a complete defense," in all

MEMORANDUM OF DECISION - 22

cases of defamation, such as libel and slander), WCP provided no evidence establishing that the foregoing statements are true and, therefore, not disparaging.[15]

On the record presented, WCP had not met its burden of affirmatively proving Blixseth's performance or an excuse for nonperformance of her obligations under the Letter Agreement. Thus, WCP has failed to meet its burden of proving its claim against xPatterns and Sandoval for breach of contract.[16] This, as noted, is a condition precedent to its ability to enforce the Guarantee.

**CONCLUSION**

WCP has not shown that Sandoval's Guarantee of xPatterns' obligation to Blixseth "no matter what may happen" creates an unconditional obligation. Nor has WCP shown that the terms in the Letter Agreement are divisible. Finally, WCP has not met its burden of establishing the requisite threshold elements to support its claim for breach of contract against xPatterns and Sandoval.

Upon the foregoing, the Court concludes that relief on the Third-party Complaint is not warranted under the facts and applicable law, and that the Third-

---

[15]   Under California law, a privileged publication or broadcast, such as one made in a judicial proceeding, cannot support a tort action for defamation or libel. Cal. Civ. Code § 47(b)(2); *Laffer v. Levinson, Miller, Jacobs & Phillips*, 34 Cal. App. 4th 117, 122 (1995). In order to invoke the privilege defense, the party must prove the communication is "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* at 122–23. However, even if such a defense were available in this contract case, WCP neither raised it nor attempted to prove the requisite elements. Therefore, the Court cannot simply dismiss the disparaging statements contained in Blixseth's complaint.

[16]   Sandoval's several other defenses need not be addressed.

MEMORANDUM OF DECISION - 23

party Complaint will be dismissed.  The Court will enter judgment accordingly.

DATED:  February 27, 2019

TERRY L. MYERS
U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 24